In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-22-00028-CR
_____

**VALYN ROSE FAULK, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 128th District Court**
**Orange County, Texas**
**Trial Cause No. A200085-R**

**MEMORANDUM OPINION**

The issue in this appeal is whether the evidence supports Valyn Rose Faulk's conviction for manslaughter under an indictment alleging that she recklessly caused the death of Derrick Cane Jr. by "operating a motor vehicle and failing to control the speed of the said motor vehicle and by failing to keep an adequate lookout for other traffic on the

1

roadway and by failing to apply the brakes in a timely manner."[1] Under Texas law, a person acts recklessly when the person "is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur."[2] On appeal, Faulk argues that the evidence is insufficient to support her conviction because the evidence doesn't establish that she was driving her car recklessly when she struck Cane, who had stepped behind a garbage truck that had stopped on the traveled portion of Farm to Market Road 3247 (FM 3247 or MLK Drive) as he was performing his job collecting garbage cans left beside the road. The collision occurred around four and one-half seconds after the garbage truck stopped.

At trial, the State's theory of the case was that Faulk acted recklessly by failing to keep a proper lookout for a period of 15 seconds as she approached the truck, by failing to apply her brakes before hitting the truck, and by driving her car at a speed of 53 miles per hour in a residential area, a road that runs by a church and school. The posted speed limit in the area where the collision occurred is 50 miles per hour.

---

[1] *See* Tex. Penal Code Ann. § 19.04(a).
[2] *Id.* § 6.03(c).

In closing argument, Faulk's attorney argued that the State failed to prove that Faulk had acted recklessly because the evidence didn't show Faulk had been driving at an excessive rate of speed, and he attributed the fact that she didn't see the garbage truck to a problem with glare from the sun and poor markings on the back of the truck, yellow hazard lights that were the same color as the glare from the sun.

On appeal, a video-recoding from inside the cab of the truck shows the garbage truck had stopped for just under five seconds when Faulk's car rear-ended the truck. But the evidence admitted in the trial doesn't show where the garbage truck turned onto FM 3247 or whether the garbage truck had been in the southbound lane of FM 3247 for a full fifteen seconds before the collision occurred. The evidence also doesn't show how fast the garbage truck was traveling on FM 3247 before it began to slow down in preparing for the stop, whether the driver of the truck signaled to traffic behind the truck that the truck would be slowing to stop, or whether the hazard warning signals on the back of the truck came on automatically when the truck slowed below a given speed. The jury heard no evidence that Faulk knew that garbage trucks or trucks on FM 3247 customarily stopped in the area where the collision occurred

while men on the truck performed work in the traveled portion of the road or that signs in the area warned drivers to be prepared to stop because drivers should expect that individuals could be working from trucks that were stopped in the traveled portion of the road.

On this record, we conclude the evidence is insufficient to establish that Faulk was aware of but consciously disregarded a substantial and unjustifiable risk that someone would be working in the road or that a truck would be stopped so that an employee on the truck could perform work in the traveled portion of the road. Accordingly, we reverse the trial court's judgment and render a judgment of acquittal.

## Background

Viewed in the light most favorable to the verdict, the evidence in Faulk's trial shows that on November 26, 2018, Faulk rear-ended a Waste Management garbage truck while both vehicles were in the southbound lane on MLK Drive, a two-lane roadway with a turning lane in the middle and an improved shoulder.[3] As mentioned, a videotape from inside the garbage truck shows the truck had been stopped for four and

---

[3]*Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017).

4

one-half seconds before Faulk struck it with her car. The speed limit in the area where the collision occurred is 50 miles per hour. Additionally, the speed limit changes from 55 to 50 about 200 yards north of the location where Faulk rear-ended the truck.

Derrick Cane Jr., a Waste Management employee working on the back of the garbage truck, was fatally injured in the collision. Fifteen months after the collision occurred, the State indicted Faulk, charging her with manslaughter.[4] The indictment alleges that Faulk recklessly caused Cane's death based on the way she operated her car, specifically by failing to control her speed, failing to keep an adequate lookout for other traffic on the roadway, and failing to timely apply her brakes before the collision occurred.[5]

The parties tried the case to a jury in December 2021. The State's theory in the trial was that the garbage truck was on FM 3247 in front of Faulk for fifteen seconds and that during that period Faulk was applying her makeup rather than keeping a proper lookout for traffic in front of

---

[4]Tex. Penal Code Ann. § 19.04(a).
[5]The indictment also alleged that Faulk caused Cane's death by operating her vehicle while intoxicated or under the influence of a controlled substance or drug. The State dropped those claims before the trial occurred.

5

her. According to the State, it was reckless for Faulk not to have watched the road for that fifteen seconds because during those fifteen seconds she could have seen the garbage truck, slowed down, and stopped her car.

Adrienne Fontenot, who was also employed by Waste Management, was driving the garbage truck when the collision occurred. At trial, Fontenot testified that she felt the effect of a collision but didn't see Faulk's car when it approached her truck. The State also called Sam Watters Jr., who testified he was driving "three cars back" from Faulk and saw the collision occur. Watters neither testified to the speed at which he was driving his car, nor did he provide the jury with an estimate of the speed of Faulk's car. According to Watters, he could see there was a garbage truck, he saw "[e]veryone was slowing down," but he never saw Faulk's car slow down. Watters explained that after witnessing what he described as "a very violent collision[,]" he "proceeded to slow down, exit [his] vehicle, and [he] call[ed] 911."

Following the collision, several officers from the Orange Police Department responded to the scene. Detective Isaac Henry III, the officer in charge of investigating the wreck, testified that he spoke with Faulk while she was still at the scene. Detective Henry explained that he

observed Faulk's demeanor and in the report that he prepared of his investigation, Detective Henry noted that he didn't notice that Faulk exhibited any signs of intoxication. Detective Henry explained that he examined Faulk's car, and he testified that in her car he saw an open bag with makeup in it and there were also open bottles of makeup loose in her car. Henry also said that he noticed the presence of dark marks on the airbag of Faulk's car, which Henry said he thought were smudges of makeup. Detective Henry noted that the sun visor on the driver's side of Faulk's car "was pulled down," and the slide to the visor, which allows the mirror in the visor to show, was open. Detective Henry testified that he believed that a dark substance on the car's driver's side airbag was mascara. Yet Detective Henry conceded he wasn't certain the substance on the airbag was mascara because it was never tested.

Detective Henry testified that with Faulk's permission, he examined Faulk's cell phone and determined that when the collision occurred, she wasn't texting or using her phone. The detective added that Faulk left the scene and went to the hospital, where she was treated for a concussion. When Detective Henry went to the hospital to speak to Faulk, he first spoke to her mother, who told him that Faulk had suffered

two prior concussions when she was in high school. Detective Henry then spoke to Faulk in a room in which the lights had been dimmed. Faulk told the detective she had a headache and nausea. According to Detective Henry, when he asked her about the wreck, she told him that "she just remembered getting her keys and leaving the house." She also told him she was headed to work that day, and she said she worked at a restaurant in Orange, which she named.

On cross-examination, Detective Henry agreed that the fact he saw bottles of makeup strewn about in the car could be consistent with having an open bag of makeup in the car when the car was involved in a collision. He also agreed that a person who is wearing lipstick or mascara may transfer the makeup they are wearing to the airbag when the airbag is deployed.

The State called Dean Nance to testify about the data he obtained from the control unit in Faulk's car (the black box). Nance testified that he is trained in the science of reconstructing accidents. After explaining how he obtained the right to access the black box in Faulk's car, Nance testified that the data he extracted from Faulk's car shows that she was traveling at an average speed of 53 miles per hour in the five seconds

8

before rear-ending the truck. Nance also explained that the data he extracted from the black box shows that Faulk never applied her brakes before hitting the truck. On cross-examination, Nance agreed he was never asked by the State to reconstruct the accident. Nance also agreed that given the posted speed limit in the area of the wreck, Faulk wasn't driving at a high rate of speed.

To establish that the garbage truck was visible for fifteen seconds to a driver that was in the southbound lane of FM 3247, the State relied on the testimony of Detective Stephen Ward, an employee of the Orange Police Department. Detective Ward based his testimony on an experiment that he performed the day after the collision. In the experiment, which was videotaped by a camera in the detective's car, Detective Ward assumed the garbage truck was stopped in the southbound lane of FM 3247 in the same location where Faulk struck the truck. Ward then approached the truck in the southbound lane, and based on the videotape, which was admitted into evidence, Detective Ward testified the garbage truck is visible as it is being approached in the southbound land at a distance of two-hundred yards.

Officer Michael Roush, a City of Orange patrolman, was the first police officer to arrive after he was notified by police dispatcher of the wreck. According to Officer Roush, he knew from the damage to the vehicle and from the injuries that he saw that he would need more officers to come to the scene to assist him with investigating the wreck. He checked on Faulk, who was sitting in her car, and she gave him her name but told him she couldn't locate her driver's license. Officer Roush obtained Cane's name from the emergency responders who were treating Cane at the scene.

Officer Roush testified that he then began photographing the evidence at the scene. The photos he took were admitted into evidence as Exhibits 6-23. One of the photos shows that Cane was wearing a fluorescent green vest. A photo of the driver's seat of Faulk's car, Exhibit 20, shows what Officer Roush described as an open bottle of mascara on the driver's seat of Faulk's car. A picture of the sun visor in Faulk's car shows that the cover to the mirror, which works as a slide built into the visor, is open. The photo shows that some areas of the sun visor are darker than others. Officer Roush described these darker areas as "smudges of makeup found near the mirror of [Faulk's] . . . vehicle."

Officer Roush also testified that when he arrived on the scene, the truck's "yellow flashing lights on the back end [were] operating[.]" Officer Roush added that to his knowledge, the truck's yellow flashing lights continued to flash while the police were investigating the crash at the scene. On cross-examination, Officer Roush agreed that as to the smudges and makeup in the photos, he didn't have any idea how long the substances on those areas had been present, how the smudges got there, or what the material deposited on the sun visor and airbag were.

Faulk rested after her attorney moved for a directed verdict. When Faulk moved for a directed verdict, her attorney argued the State failed to present sufficient evidence to allow a rational jury to conclude that Faulk had acted recklessly in causing the wreck that resulted in Cane's death. The trial court denied Faulk's motion. In closing argument, the prosecutor argued that although nothing is certain, Faulk was "probably putting on her makeup[,]" but that it didn't really matter exactly what she was doing because Faulk "consciously disregarded" her duty to keep an adequate lookout "by taking her eyes off the road[.]" According to the prosecutor, her conduct was reckless because she was driving "55 miles per hour down a street with homes, a church, a school" when for "[f]ifteen

seconds before she killed [Cane] she could see that truck." The prosecutor summed it up by arguing it was a gross deviation from the standard of care for Faulk to have failed to keep her eyes on the road for "such a long period of time."

The jury found Faulk guilty of manslaughter. Following the punishment phase of the trial, the jury assessed a five-year sentence with no fine, and the jury recommended that Faulk's sentence be suspended. The trial court signed a judgment consistent with the jury's verdict, suspended Faulk's sentence, and placed Faulk on community supervision for ten years. After the trial court signed the judgment, Faulk filed a timely notice of appeal.

## Standard of Review

In one issue, Faulk argues the trial court erred in denying her motion for a directed verdict because the evidence is insufficient to show that she acted recklessly—the mens rea attached to proving manslaughter.[6] On appeal, we treat a point of error challenging the trial

_____

[6] *Id.* § 6.03(c); *id.* § 19.04(a).

12

court's denial of a motion for directed verdict as a challenge to the sufficiency of the evidence.[7]

We review the sufficiency of the evidence to support a conviction under the standard set forth in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).[8] Under that standard, we view the evidence in the light most favorable to the verdict and determine, based on that evidence and any reasonable inferences therefrom, whether any rational factfinder could have found the essential elements of the offense beyond a reasonable doubt.[9] "The jury is the sole judge of credibility and weight to be attached to the testimony of witnesses."[10] In this role, the jury may choose to believe all, some, or none of the testimony presented by the parties.[11] Further, the jury is permitted to draw multiple reasonable inferences from facts as long as each is supported by the evidence presented at trial.[12] When the record supports conflicting inferences, we presume that

---

[7]*See Canales v. State*, 98 S.W.3d 690, 693 (Tex. Crim. App. 2003); *Williams v. State*, 937 S.W.2d 479, 482 (Tex. Crim. App. 1996).

[8]*See Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010).

[9]*Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013) (citing *Jackson*, 443 U.S. at 318-19).

[10]*Id.*

[11]*Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991).

[12]*Temple*, 390 S.W.3d at 360.

the jury resolved those conflicts in favor of the verdict and therefore defer to that determination.[13]

In reviewing the sufficiency of the evidence, we consider all the evidence in the record, regardless of whether it was properly admitted.[14] Direct and circumstantial evidence are equally probative of an actor's guilt, and "'circumstantial evidence alone can be sufficient to establish guilt.'"[15] In a circumstantial evidence case, each fact need not point directly and independently to the guilt of the defendant so long as the combined and cumulative force of all the incriminating circumstances warrants the conclusion that the defendant is guilty.[16] "After giving proper deference to the factfinder's role, we will uphold the verdict unless a rational factfinder must have had reasonable doubt as to any essential element."[17]

Every criminal conviction must be supported by legally sufficient evidence as to each element of the offense that the State must prove

---

[13]*Id.*
[14]*Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).
[15]*Temple*, 390 S.W.3d at 359 (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)).
[16]*Id.* (quoting *Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993)); *Hooper*, 214 S.W.3d at 13.
[17]*Laster v. State*, 275 S.W.3d 512, 518 (Tex. Crim. App. 2009).

beyond reasonable doubt.[18] To decide if this standard has been met, we review the evidence in the light most favorable to the verdict and decide whether a rational trier of fact could have found the essential elements of the crime under the required standard of beyond reasonable doubt.[19] Evidence in a trial may be circumstantial or direct, and we allow juries to draw multiple reasonable inferences from the evidence with which they are presented in a trial.[20] "Each fact need not point directly and independently to a defendant's guilt, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction."[21]

"When considering a claim of evidentiary insufficiency, a reviewing court does not sit as the thirteenth juror and may not substitute its judgment for that of the factfinder by reevaluating the weight and credibility of the evidence."[22] "The jury is the sole judge of credibility and weight to be attached to the testimony of witnesses."[23] "If the record

---

[18]*See Jackson*, 443 U.S. at 315-16; *Brooks*, 323 S.W.3d at 917.
[19]*Id.*
[20]*Merritt v. State*, 368 S.W.3d 516, 525 (Tex. Crim. App. 2012).
[21]*Balderas v. State*, 517 S.W.3d 756, 766 (Tex. Crim. App. 2016).
[22]*Garcia v. State,* 667 S.W.3d 756, 762 (Tex. Crim. App. 2023).
[23]*Temple*, 390 S.W.3d at 360.

supports conflicting inferences, the reviewing court must presume that [the jury] resolved the conflicts in favor of the prosecution and defer to the jury's factual determinations. In other words, when there are two reasonable interpretations of the evidence, [the jury's] choice between them cannot be clearly erroneous."[24]

A legally sufficient showing of manslaughter requires proof that (1) the defendant's conduct caused the death of an individual; (2) the defendant created a substantial and unjustifiable risk of death from their conduct; (3) the risk was of such a magnitude that disregarding it constituted a gross deviation from the standard of care an ordinary person would have exercised under like circumstances; and (4) the defendant was consciously aware of the risk of death from their conduct, but consciously disregarded the risk.[25] The circumstances must be viewed from the standpoint of the actor when the allegedly reckless act occurred, without viewing the matter in hindsight.[26]

"[M]ere lack of foresight, stupidity, irresponsibility, thoughtlessness, ordinary carelessness, however serious the

---

[24]*Garcia*, 667 S.W.3d at 762 (cleaned up).
[25]*Williams v. State*, 235 S.W.3d 742, 755-56 (Tex. Crim. App. 2007).
[26]*Id.* at 753.

16

consequences may happen to be, do not suffice to constitute either culpable negligence or criminal recklessness."[27] Criminal liability arises when "some serious blameworthiness" attaches to the conduct that caused a "substantial and unjustifiable" risk of death.[28] Unlike criminally reckless conduct, "[c]ivil or 'simple' negligence means the failure to use ordinary care, that is, failing to do that which a person of ordinary prudence would have done under the same or similar circumstances or doing that which a person of ordinary prudence would not have done under the same or similar circumstances."[29] "With criminal negligence, the defendant ought to have been aware of a substantial and unjustifiable risk that [their] conduct could result in the type of harm that did occur, and that this risk was of such a nature that the failure to perceive it was a gross deviation from the reasonable standard of care exercised by ordinary people."[30] "The key to criminal negligence is not the actor's being aware of a substantial risk and disregarding it, but rather it is the failure of the actor to perceive the risk at all."[31]

---

[27]*Id.* at 751. (cleaned up).
[28]*Tello v. State*, 180 S.W.3d 150, 157-58 (Tex. Crim. App. 2005).
[29]*Queeman*, 520 S.W.3d at 623.
[30]*Williams*, 235 S.W.3d at 750-51.
[31]*Montgomery v. State*, 369 S.W.3d 188, 193 (Tex. Crim. App. 2012).

On the other hand, "the heart of reckless conduct is conscious disregard of the risk created by the actor's conduct."[32] Criminal "[r]ecklessness requires the defendant to *actually foresee* the risk involved and to *consciously decide* to ignore it."[33] "Criminal recklessness must not be confused with (or blended into) criminal negligence, a lesser culpable mental state."[34] "Criminal negligence depends upon a morally blameworthy failure to appreciate a substantial and unjustifiable risk while recklessness depends upon a more serious moral blameworthiness—the actual disregard of a known substantial and unjustifiable risk."[35]

Generally, whether a defendant's conduct constitutes criminal negligence or recklessness must be inferred from the surrounding circumstances.[36] We recognize that jurors may draw reasonable inferences from evidence admitted in a trial, yet jurors may not draw conclusions from inferences that are based on speculation or when the

---

[32]*Williams*, 235 S.W.3d at 752.
[33]*Id*. (emphasis added).
[34]*Id*. at 750.
[35]*Id*. at 751 (emphasis added).
[36]*Romano v. State*, 610 S.W.3d 30, 35 (Tex. Crim. App. 2020).

inference the jury makes is unsupported by the evidence.[37] The Court of Criminal Appeals distinguished between a jury's making a reasonable inference and speculating, explaining:

> Speculation is mere theorizing or guessing about the possible meaning of facts and evidence presented. While a conclusion reached by speculation may not be completely unreasonable, and it might even prove to be true, it is not sufficiently based on facts or evidence to support a finding beyond a reasonable doubt.[38]

Analysis

The parties to the appeal disagree whether the evidence when viewed in the light most favorable to the jury's verdict and from Faulk's standpoint—the standpoint of a driver on a road with a posted speed limit of 50 miles per hour—proves beyond reasonable doubt that Faulk was aware of but chose to consciously disregard a substantial and unjustifiable risk that a garbage truck would stop on the traveled portion of the road. On this record, we conclude the State failed to present sufficient evidence to allow the jury to infer that Faulk was aware of but consciously disregarded a substantial and unjustifiable risk under the circumstances when viewed from her standpoint.

---

[37] *Metcalf v. State*, 597 S.W.3d 847, 859 (Tex. Crim. App. 2020).
[38] *Id.* (cleaned up).

We reach that conclusion for these four reasons. First, the jury didn't hear any testimony about how garbage trucks usually pick up trash cans left alongside FM 3247. For that reason, there isn't any evidence in the record that shows that drivers on FM 3247 who are familiar with the road and the usual driving conditions on that roadway would have been aware of the way garbage trucks normally use the traveled portion of FM 3247 to pick up trash. There is no testimony in the record about whether garbage trucks using this road typically pull over on the shoulder before stopping to pick up trash. There is also no evidence in the record that shows that Faulk was aware trucks would be stopping in the road. And there is no evidence that there were signs warning drivers that they should be prepared to stop because trucks would be stopping because men on the truck would be working in the traveled portion of the road.

Second, there isn't any testimony in the record that shows the warning that a driver approaching the garbage truck from the rear would normally receive that the garbage truck was preparing to stop so that men on the truck could perform work while standing in the road. To be clear, the jury could infer from the evidence that the lights on the back of

the truck were working after the collision and that the flashing lights on the back of the truck were flashing for 4 and one-half seconds after the truck stopped. Yet there isn't any evidence that Faulk saw them after they began flashing. And the fact lights began flashing after the truck stopped doesn't show what warning, if any, a car approaching from the rear of the truck would have had as the truck was slowing down to stop.

When the truck's driver testified, she didn't testify how the lights on the back of her truck work. She also didn't explain whether she engaged the lights before or after she stopped the truck. For that reason, its speculative as to whether an approaching driver would have had flashing lights as a warning that they were approaching a slow-moving truck for a period of 8 to 9 seconds before the truck stopped.

Third, the prosecutor never questioned the garbage truck's driver about when she first started driving the truck in the traveled portion of FM 3247 in the fifteen-second window in which the prosecutor theorized that the truck was in Faulk's line of sight. The video from inside the cab shows the truck moving for about four to five seconds before it stops, and the video also shows the truck stopped in the southbound lane of FM 3247 for about 4 and one-half seconds before the collision occurs. There isn't

any testimony in the trial that shows how fast the truck was traveling when it was moving, but it's clear that the truck is moving for less than five seconds, and it is not moving and stopped for 15 seconds before the collision occurred. Thus, while the truck would have been visible from two-hundred yards away, it's speculative as to whether, during that full 15 seconds, the truck was in the southbound lane and when the defendant would have realized it was in her lane had she been keeping a proper lookout for it as she approached it from behind.

Fourth, based on this record, we conclude that *Queeman v. State* provides the guiding principles that we must follow to resolve whether the evidence before us is sufficient to rationally support the jury's inference that Faulk's conduct was reckless. To begin, we note that *Queeman* involved a rear-end collision case in which the Court of Criminal Appeals found the evidence insufficient to support the jury's finding convicting the defendant of criminally negligent homicide, a mens rea that requires less knowledge (ought to be aware) than the mens rea necessary to prove recklessness, an offense that requires the State to prove the defendant's actual awareness of the circumstances of their

22

conduct and a conscious disregard of a substantial and unjustifiable risk.[39]

At trial, the State trooper who investigated the collision in *Queeman* determined that the SUV the defendant rear-ended was stopped or nearly stopped when the collision occurred, the SUV's brake lights were illuminated, and the defendant failed to brake until "just before or at the time that he struck the SUV."[40] The trooper didn't cite the defendant for speeding and conceded that he "had no way of knowing specifically [the defendant's] actual pre-accident speed." Even though the trooper conceded he didn't know the defendant's speed, he testified that he thought the defendant was driving significantly faster than the posted speed limit of 40 miles per hour.[41]

In reviewing the sufficiency of the evidence on speeding, the Court of Criminal Appeals determined the evidence allowed the jury to infer that the defendant had been speeding, but wasn't sufficient to prove criminal negligence because the evidence failed to show that the

---

[39]*See Queeman,* 520 S.W.3d at 619; *compare* Tex. Penal Code Ann. § 6.03(c), *with id*. § 6.03(d).
[40]*Id*. at 620.
[41]*Id*. at 621 & 621 n.3.

23

defendant "engaged in any more extreme, aggressive, or foolish driving acts than are ordinarily engaged in by drivers and accepted as reasonable risks in exchange for the social utility provided."[42] Since the evidence didn't establish a basis on which the jury could infer the defendant was driving at an excessive speed, the *Queeman* Court held that a rational juror "could not conclude that [the defendant] was excessively speeding because that would require speculation beyond what is shown by the evidence or what could be rationally inferred from the evidence in the record."[43]

Turning next to the evidence addressing the defendant's inattentiveness in failing to apply her brakes, the *Queeman* Court agreed the evidence established the defendant had been inattentive but still observed:

> Driving is a common activity that has risks about which a reasonable person would be cognizant. Failure to appreciate those risks and the circumstances that create them can support ordinary negligence. Criminal negligence, however, requires a greater showing—that the risk is 'substantial and unjustifiable' and that the failure to perceive the circumstances creating the risk is a 'gross deviation' from the usual standard of care."[44]

---

[42]*Id.* at 631.
[43]*Id.* at 625.
[44]*Id.* at 630.

On the evidence in *Queeman*—a case that involved an "ought to be aware" standard which we note is lower than the "aware of but consciously disregards" standard at issue here—the *Queeman* Court concluded that the proof of speed and failure to see the vehicle that was rear-ended failed to show the defendant was guilty of criminal negligence.[45]

Turning to Faulk's case, the recklessness standard requires that the evidence be viewed "from the actor's standpoint."[46] According to Faulk, the evidence when viewed from her standpoint is insufficient to show that she acted recklessly in failing to control her speed, in failing to timely apply her brakes, or in failing to keep a proper lookout for other traffic on FM 3247.

As to Faulk's speed, the case is like *Queeman* in that the State's evidence doesn't establish that Faulk was driving at an excessive rate of speed. The evidence when viewed in the light most favorable to the jury's verdict establishes that Faulk was driving her car at 53 miles per hour in a 50-miles per hour zone. Sam Watters, in a car three car lengths

[45]*Id*. at 631; *compare* Tex. Penal Code Ann. § 6.03(c) (culpable mental state for recklessness), *with id*. § 6.03(d) (culpable mental state for criminal negligence).
[46]Tex. Penal Code Ann. § 6.03(c).

behind Faulk, testified other cars were slowing for the garbage truck. But Watters didn't testify that Faulk was driving at an excessive speed. He also didn't testify about what side of the road the cars were on that he saw slowing for the garbage truck. Clearly cars slowing for the truck weren't between Faulk's car and the truck, or she would have hit them before hitting the truck. Watters also didn't distinguish between whether he noticed the cars slowing before or after the collision occurred. Finally, Watters never testified about how fast he was going before he saw Faulk hit the truck.

We acknowledge that the record includes testimony that churches and schools are located alongside FM 3247. Yet there isn't any testimony that the collision occurred in a school zone or that Faulk was cited for speeding. In his opening statement, the prosecutor conceded that Faulk "wasn't speeding particularly fast." There is also no testimony in the trial that Faulk was weaving in and out of traffic or in a hurry to get to work. The data from the black box revealed that Faulk's speed was a few miles above the speed limit when the collision occurred. None of this evidence shows that Faulk was aware of but consciously disregarded a substantial

and unjustifiable risk that a garbage truck would stop in the traveled portion of FM 3247.

As to Faulk's failure to apply her brakes, the case is also like *Queeman* in that the evidence is clearly sufficient to support the jury's finding that Faulk failed to timely apply her brakes. The data from the black box revealed that Faulk never hit her brakes. That said, the fact Faulk didn't hit her brakes before colliding with the truck doesn't show that she was consciously aware of but disregarded a substantial and unjustifiable risk that a garbage truck would stop on the traveled portion of FM 3247.

Turning to Faulk's failure to keep a proper lookout, the evidence shows that Faulk failed to keep a proper lookout—she struck a large truck without applying her brakes or taking evasive action to avoid a collision. But the question is whether the State met its burden to prove that Faulk was aware of but consciously disregarded a substantial and unjustifiable risk of the garbage truck stopping on the traveled portion of the road. Boiled down, the State's theory was that the truck was in front of her for fifteen seconds and she could have seen it and slowed down had she kept her eyes on the road. But as we have discussed, the State didn't

establish that the garbage truck was in the southbound lane for a full fifteen seconds before the collision, and it didn't establish that Faulk saw the warning provided by the lights on the back of the truck before the collision occurred.

As to Detective Ward's experiment that shows him approaching a garbage truck in the southbound lane, which was designed to demonstrate that the truck is visible to southbound traffic at a distance of two-hundred yards from where the collision occurred, we note that the experiment was conducted under conditions that were different from those confronted by Faulk. The garbage truck involved in the experiment was always stationary and not moving like the garbage truck Faulk approached on the day the collision occurred. And Detective Ward was *aware* as he approached the garbage truck that it was stopped on FM 3247, an awareness that had he collided with the truck is an awareness that would be probative to a jury's finding of recklessness had the officer with that knowledge collided with the truck.

We turn last to the State's theory that Faulk was inattentive to her driving tasks because she was putting on her makeup as she was approaching the truck. If the jury believed Faulk was putting on her

28

makeup and that task distracted her attention from the road, that evidence shows that Faulk misjudged how long she allowed her attention to be diverted from her task of driving her car. The evidence doesn't show that Faulk was aware of but consciously disregarded a substantial and unjustifiable risk when she diverted her attention from the road while applying makeup even if she misjudged how long it might take her when there is no evidence that shows Faulk had any reason to know or expect that there was a substantial risk a truck with a worker might stop on the road to allow a worker on the truck to perform work in the traveled portion of a 50-miles-per-hour road. Stated another way, the fact that a person misjudges how long a task might take when the task represents a temporary diversion of the driver's attention from the ordinary task of driving is a risk about which reasonable persons are cognizant, and proof that a person failed to appreciate that risk is a circumstance that will support a claim for ordinary negligence. But proving a claim of criminal negligence requires a greater showing that by the defendant's acts, the defendant assumed a substantial and unjustifiable risk. And proving a claim of recklessness (which is what the State undertook to prove here) requires even more still—proof of the defendant's awareness of a

29

substantial and unjustifiable risk and proof of the defendant's conscious disregard.[47]

When viewing the circumstances from Faulk's standpoint, as we must, we conclude the evidence doesn't support a rational inference that Faulk was aware of but consciously disregarded a substantial and unjustifiable risk that she would rear-end a garbage truck on FM 3247, a 50-miles-per-hour road. Moreover, the evidence the State presented did prove beyond a reasonable doubt that Faulk diverted her attention from the road for a full 15 seconds, which is what the State claimed is the period that constitutes recklessness. Consequently—even though the evidence establishes Faulk's negligence in failing to control her speed, failing to keep a proper lookout, and failing to brake and that her negligence contributed to the collision—that evidence is insufficient to support the inference that she was reckless. We sustain Faulk's sole issue.

---

[47]*Compare Queeman*, 520 S.W.3d at 630, *with* Tex. Penal Code Ann. § 6.03(c).

Conclusion

For the reasons explained above, we reverse the judgment convicting Faulk of manslaughter and render a judgment of acquittal.

REVERSED AND RENDERED.

HOLLIS HORTON
Justice

Submitted on August 1, 2023
Opinion Delivered March 6, 2024
Do Not Publish

Before Horton, Johnson and Wright, JJ.

31